IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ex rel. )
TITUS LINTON #K-62396, )
 )
               Petitioner, )
 )
v. )   No.  05 C 7084
 )
WARDEN BATTAGLIA, )
 )
               Respondent. )

MEMORANDUM OPINION AND ORDER

After this Court had conducted its preliminary review of the 28 U.S.C. §2254[1] Petition for Writ of Habeas Corpus ("Petition") filed by Titus Linton ("Linton") to challenge the lengthy sentences he is serving after his state court conviction on charges of first degree murder and attempted first degree murder (see Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules")), it ordered respondent Warden Deirdre Battaglia to file her Answer to the Petition (id.).[2] That Answer and its associated exhibits have been filed, and they call for the denial of the Petition for the

---

[1] All further references to Title 28's provisions will simply take the form "Section--."

[2] Although Linton had filled in the form of Petition provided by this District Court's Clerk's Office by adding the Illinois Attorney General as an additional respondent, that stemmed from a misreading of the instructions in that form. Because only Warden Battaglia as Linton's custodian is the proper respondent, Attorney General Lisa Madigan is dismissed as a putative party (although of course her office is acting as defense counsel for the Warden).

reasons stated here.

As a preliminary matter, even though Linton is not challenging his conviction itself, the underlying facts of his offenses are relevant to the issues. That being the case, this opinion attaches as its Exhibit 1 the account provided by the Illinois Appellate Court for the First District at pages 3-11 of its ultimate dispositive order ("Order") that was entered on January 9, 2004 in its Case No. 1-98-1247.[3]

To set the remaining framework for consideration of the Petition, Answer ¶6 describes Linton's contentions in these terms:

> On October 3, 2005, this Court received petitioner's habeas petition, which raises three claims:
>
> I. petitioner's natural-life and 60-year extended sentences violate Apprendi;
>
> II. the Illinois extended-term sentencing statute is void and unconstitutional; and
>
> III. the appellate court erred when it applied plain-error analysis to petitioner's Apprendi claim on direct appeal.

That characterization will be followed in the analysis here, for although the Petition actually states four grounds rather than three, the fourth ground ("Brutal and heinous elements was not

---

[3] That Order stemmed from the Illinois Supreme Court's directive in its Case No. 91781 that the Appellate Court's earlier judgment be vacated for reconsideration in light of that Supreme Court's reading and application of Apprendi v. New Jersey, 430 U.S. 460 (2000).

2

proven beyond a reasonable doubt") is really subsumed within the first issue.

With those things in place, a few brief comments will suffice to eliminate some preliminary nonissues in the case. First, Answer at 6 has correctly conceded that Linton, who tendered the same issues to the Illinois Appellate Court and then was unsuccessful in seeking leave to appeal to the Illinois Supreme Court, has exhausted his state court remedies as required by Section 2254(b)(1)(A)(see O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)). And Answer at 6-7 has conceded with equal correctness that Linton, having been turned down by the state appellate courts on the merits of his federal constitutional claims, has not procedurally defaulted any of those claims.

Hence this opinion can turn directly to the merits of Linton's claims. In that respect Section 2254(d) states the ground rules:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3

And the definitive exposition of those requirements is provided by <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06, 409-11 (2000).

## I. **Apprendi** Violation

In addition to the concessions described earlier, the Answer also concedes the first substantive issue raised by Linton. Because the heavy sentences that were imposed on him were based on the findings of the trial court, without submission to the jury, that his conduct constituted "exceptionally brutal or heinous behavior indicative of wanton cruelty," and because the terms of those sentences consequently exceeded the otherwise applicable maximum sentences, the trial court clearly ran afoul of the constitutional rule announced in <u>Apprendi</u>. That was correctly acknowledged by the Illinois Appellate Court (Order at 20), and respondent does not dispute it now.

## II. Constitutionality of the Illinois Statutes

Although the resolution of that first issue in Linton's favor unquestionably requires this Court to evaluate, in federal constitutional terms, the application to him of the state statutes that permitted those heavy sentences (730 ILCS 5/5-5-3.2(b)(2) and 5-8-1(a)(1)(b)[4]), the statutes survive an attack of unconstitutionality on voidness grounds. That is so because the statutes did not <u>require</u> the finding as to the egregiousness of

---

[4] That latter statute has since been amended to conform to the <u>Apprendi</u> requirements.

4

Linton's conduct to be made by the trial judge rather than the jury--instead it _permitted_ that to be done, so that when that occurred there was an _Apprendi_ violation.

That is the reading given by the Illinois Supreme Court in addressing the Illinois statute that provides for extended-term sentences (_Lucien v. Briley_, 213 Ill.2d 340, 344, 821 N.E.2d 1148, 1151 (2004)), and in this case the Illinois Appellate Court quoted and followed that holding in its consideration of the issue (Order at 14). In that respect the state courts' analysis of the Illinois statute tracks the analysis employed by our own Court of Appeals in _United States v. Brough_, 243 F.3d 1078, 1079 (7th Cir. 2001) in addressing a like argument as to the claimed facial unconstitutionality of 21 U.S.C. §841(b).

Under these circumstances it is really an understatement to say that the _Lucien_ determination (and hence the Illinois Appellate Court's determination in the Order) was neither contrary to nor an unreasonable application of _Apprendi_, nor does that determination flout any other United States Supreme Court precedent. In sum, Linton's statutory voidness argument is a loser.

### III. Application of Plain-Error Analysis

That then leaves for resolution Linton's remaining ground, reproduced here in full (and of course verbatim) from the Petition:

5

> Brutal and Heinous Elements Was Not Proven Beyond a
> Reasonable Doubt
>
> Supporting facts:
>
> A brutal and heinous determination is a factual finding
> which takes the sentence above the sentencing range and
> "which must be proven to a jury beyond a reasonable
> doubt. The Appellate Court erred in speculating about
> a hypothetical jury's action, without an actual jury
> finding of guilty when it stated, "[W]e have no doubt
> that the jury which heard these facts would have found
> that the crimes were committed in a "brutal and heinous
> manner", if they had been properly instructed on the
> issue." And guilt was established by accountability
> not as a principal in Linton's case. The phrase
> "exceptionally brutal or heinous conduct indicative of
> wanton cruelty" is not defined by statute. Rather,
> this phrase gathers its meaning from case-by-case
> basis, individual construe the evidence heard. While
> one rational jury could find that an offense was brutal
> and heinous, another could find the opposite based on
> the same evidence.

Analysis of that position clearly calls for its rejection.

As for the applicability of plain-error analysis, the United States Supreme Court in <u>United States v. Booker</u>, 543 U.S. 220, 268 (2005) has said this in explaining why that decision did not require a new sentencing in every case then pending on direct review:

> That is because we expect reviewing courts to apply
> ordinary prudential doctrine, determining, for example,
> whether the issue was raised below and whether it fails
> the "plain-error" test.

And our own Court of Appeals has consistently treated <u>Apprendi</u> violations as non-structural errors by employing plain-error review (in that respect respondent has correctly cited to <u>United States v. Hernandez</u>, 330 F.3d 964, 983 & n.13 (7th Cir. 2003),

United States v. Martinez, 289 F.3d 1023, 1027 (7th Cir. 2002), United States v. Alanis, 265 F.3d 576, 589 (7th Cir. 2001), United States v. Gilliam, 255 F.3d 428, 434-35 (7th Cir. 2001), United States v. Robinson, 250 F.3d 527, 529-30 (7th Cir. 2001) and United States v. Nance, 236 F.3d 820, 824 (7th Cir. 2000)).

Finally, the Illinois Appellate Court's application of that plain-error standard in Linton's case similarly passes muster under Williams v. Taylor. That is evident from its impeccable handling of that subject.

First, in terms of identifying the relevant standard, the Illinois Supreme Court in People v. Crespo, originally reported at 203 Ill.2d 335, 788 N.E.2d 1117 (2001), had later issued a further opinion to address the appropriate criteria for dealing with Apprendi-based claims that challenge the same type of plain-error application of the same statute--730 ILCS 5/5-5-3.2(b)(2)--that Linton attacks here. And in denying rehearing in Crespo on March 31, 2003, that court expressly quoted from, and applied the same plain-error standard as, the United States Supreme Court's opinion in United States v. Cotton, 535 U.S. 625, 631 (2002)(see 203 Ill.2d at 348, 7788 N.E.2d at 1124). Because the Appellate Court's Order at 21 expressly drew upon both of those decisions (Crespo and Cotton), its own plain-error approach plainly adhered to, and could not be considered as contrary to, United States Supreme Court precedent.

7

Second, as to the application of that standard to Linton's case, it is well worth quoting at length how Order at 22 addressed that issue before reaching its conclusion that there was indeed no plain error in the trial court's determination:

> In the case before us, the evidence overwhelmingly favors a finding that the crimes were committed in a brutal or heinous manner. Before they killed her, defendant and his accomplices tied Claudio to a furnace, gagged her, and interrogated her repeatedly about what they perceived as a betrayal of their street gang. Such action can easily be described as terrorizing and endangering the victim. There is no indication in the record that the victims offered any resistance or posed any threat to the offenders. Nevertheless, defendant's accomplice shot Claudio in the head while she ran for her life. This conduct can clearly be described as devoid of mercy. Although the offenders did not terrorize White in the same way they terrorized Claudio, the attempt to murder her was similarly cold-blooded and flagrantly criminal. The attempted murder of White was not even motivated by the same misguided belief in a need for gang security that motivated the slaying of Claudio. Instead, the offenders ultimately agree that White should die merely because she had the misfortune of associating with Claudio. This conduct reflects a complete disregard for the sanctity of human life and can be easily categorized as "shockingly evil." Simply put these crimes were senseless, unnecessarily cruel and cold-blooded, and demonstrated a callous disregard for human life. We have no doubt that the jury which heard these facts would have found that the crimes were committed in a brutal and heinous manner if they had been properly instructed on the issue.

That treatment and the resulting conclusion cannot be labeled as "plain error" in any sense of that term.

## Conclusion

Because the exhibits submitted with the Answer provide a conclusive legal response to Linton's Petition, no purpose would

8

be served by calling for a reply (as Section 2254 Rule 5(e) might otherwise permit). Instead, with those exhibits treated as though they had been tendered with the Petition itself, this case squarely fits the standard specified in Section 2254 Rule 4: "it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." No evidentiary hearing is required, and the Petition is dismissed.

                                                      _____
                                                      Milton I. Shadur
                                                      Senior United States District Judge

Date: February 13, 2006

At trial, the following evidence was introduced. April White testified on behalf of the State that on December 9, 1994, she and her friend, Anna Claudio went to the house of Loufannie Banks, one of Claudio's friends. Defendant answered the door and informed them that Banks was not in. As Claudio and White were leaving, Banks appeared and invited them back to the house. At the house, Claudio and White were directed into a back room where White was introduced to defendant, Troy Turner, also known as "Psycho," Lavelle Dunn (Lavelle) and his brother, Zsoch Dunn (Zsoch). Defendant, Banks and Turner went into the basement and were later joined by Claudio. From the basement, White heard defendant, Banks and Turner yelling and cursing at Claudio. She also heard defendant threaten Claudio that if she did not confess, they were going to hurt her, and Claudio crying and begging to be let go. Some time later, defendant returned upstairs and asked White where she lived and told her that Claudio was in a lot of trouble and was going to get hurt, but would be let go if she told the truth. Defendant then returned to the basement and White again heard Claudio being threatened by defendant and Turner and heard defendant tell Turner to put something in Claudio's mouth, at which point, Claudio's voice became muffled. Forty five minutes later, Claudio came upstairs and informed White that Banks was going to drive them home. White said that she and Claudio were wearing coats when they first entered the house, but their coats were taken from them.

Banks, Claudio, White, Turner, and a man whom White did not know left the house in a Buick automobile, while defendant left in a van with Lavelle, Zsoch and another man. Banks followed the van to Foster Park, where Turner got out to speak to defendant. When Turner returned to Banks' vehicle, he told her to drive into the park and began checking a gun for bullets, while cursing at Claudio. Banks drove into the park and she and the man from the back seat began

struggling with Claudio, trying to pull her out of the vehicle. Turner, Banks and the other man had a conversation outside the vehicle. While they were talking, Claudio cried and told White that they were going to kill them and that they needed to run. Claudio began running towards a field house in the park, while White ran in the opposite direction. White heard five or six shots fired and saw Turner chasing and shooting at Claudio. White hid in some bushes and then returned home. She did not call the police upon arriving home, but, the next day, she accompanied the police to the station where she gave a statement and identified defendant, Turner and Banks in line-ups.

Police Officer Edmund Leracz testified on behalf of the State that after he interviewed White, he drove to Banks' house, where he identified a Buick automobile, registered to Banks, which had a missing rear view mirror. A man named Kimoni Pollard answered at Bank's residence and called for her to come down. Officer Leracz transported Kimoni Pollard and Banks to the police station and learned that defendant was there on an unrelated matter. Officer Leracz met with defendant, advised him of his constitutional rights, and questioned him. Defendant told him that he was a general in the Blackstones gang and that the Blackstones engaged in narcotics distribution in midtown Chicago. Defendant said that Lavelle and his brothers, Zsoch and Mario Dunn (Mario), held the rank of "muftis" and were beneath him in rank in the gang. Defendant said that he had dated Banks for a few months and knew Claudio because she lived with Banks at one time. He said that Banks thought Claudio had been consorting with a rival gang, the Gangster Disciples.

Defendant stated that on the night Claudio and White came over, there had been a Blackstones' meeting at Banks' house earlier. When Banks, Claudio and White returned to the house, defendant went into the basement with Claudio and Banks. There, a general of the Blackstones, G-

Raheem, took Claudio's coat, money, camera and bus pass. Defendant tried to get Claudio's possessions back, but he could not because G-Raheem was a senior general. Banks and Claudio argued and defendant tried to protect Claudio. The parties then returned upstairs. and defendant had Banks take Claudio and White home and gave Claudio money for a new coat.

Claudio, White, Banks, Turner and another man known as "Short Dog" left in Banks' automobile, while defendant and the three Dunn brothers left in a van. Defendant drove the van to pick up some money, met with Banks near Foster Park and then returned to Banks' house. Later, Turner arrived at the house and told defendant that he had shot Claudio but that Short Dog should be punished because he was supposed to kill White and had not.

Officer Leracz testified that defendant said that Turner was a key person under his control in the gang, although the police report of the interview did not reflect this statement. Officer Leracz additionally stated that after making some phone calls, defendant led police officers to a house where they recovered a .380 caliber semiautomatic gun from the front porch, which had been used to kill Claudio.

The State introduced evidence showing that Claudio's body was discovered near the field house in Foster Park on December 10, 1995. An autopsy revealed that she died of multiple gunshot wounds. A bus pass, lipstick, keys and $2.85 were recovered from the victim and a rear view mirror was recovered in the parking lot. Several cartridge casings and two bullets recovered at the scene and three bullets recovered from the victim were consistent with a .380 semiautomatic gun. A camera and clothing identified as the victim's was later recovered from an alley across from defendant's house.

Lavelle Dunn testified on behalf of the State that he had been friends with defendant since 1989, that defendant held the rank of general in the Blackstones gang, and that he himself associated with the Blackstones. Lavelle stated that prior to the date of Claudio's murder, he was present during two conversations between defendant and Banks, during which, Banks told defendant that Claudio had told the Gangster Disciples that the Blackstones congregated at her house and kept their guns there. On both occasions, defendant indicated to Banks that Claudio had to be killed.

Lavelle stated that when Claudio and White arrived at Banks' house, he was present, along with his brothers, Mario and Zsoch, as well as defendant, Turner, Banks' cousin, and a man named Carl. White stayed in the living room, while defendant, Turner, Banks and Claudio went into the basement. From the basement, Lavelle could hear Claudio screaming and crying. Lavelle went to the basement and saw Claudio tied against a furnace, and defendant, Turner and Banks questioning her about what she had told the Gangster Disciples. Lavelle left the basement, but returned later and saw defendant, Turner and Banks still questioning Claudio. Lavelle then returned upstairs and, twenty minutes later, Claudio came into the living room and defendant, Banks and Turner went into the kitchen. Lavelle heard Turner tell defendant that the girls had to be killed. Defendant initially said that he wanted to let the girls go, but eventually agreed that they could not be let go. Shortly thereafter, Lavelle and his brothers left for Foster Park in a van driven by defendant, while Claudio, White, Turner and Carl followed in an automobile driven by Banks. At the park, Carl and Banks came over to the van and Banks told defendant that she didn't want to do it because the gun had only one bullet. Defendant told Banks that he had already asked Carl to do it and indicated that Carl should make sure to shoot White in the head. Carl and Banks went into the park and Lavelle heard

seven gunshots. Shortly thereafter, Turner and Carl returned to the van and Turner told defendant that Carl had messed up and let one of the girls get away. Defendant said that he would handle it because he knew where she lived. Defendant asked Turner if he was sure Claudio was dead and Turner replied that he shot her in the head and there were no bullets left in his gun. Defendant drove towards Banks house, but stopped and went into a gangway before reaching the house. After returning to the van, defendant went to Banks' house and took Lavelle and his brothers home once Banks arrived.

On cross examination, Lavelle stated that Kimoni Pollard was not a member of the Blackstones gang. When asked by defense counsel whether Kimoni Pollard was a member of another gang, Lavelle answered that he wasn't sure. Defense counsel introduced impeachment evidence that Lavelle testified at defendant's prior trial that Kimoni Pollard was a Gangster Disciple.

Assistant State's Attorney Michael Falagario testified on behalf of the State that he took defendant's statement after advising him of his constitutional rights. In his statement, defendant again related that he was a general in the Blackstones gang and that Turner, Mario, Lavelle and Zsoch were lower ranking gang members, obligated to follow his orders and subject to disciplinary action, known as a "violation" if they did not. Defendant stated that he taught Turner how to sell drugs and the laws of the gang and he looked up to defendant as a big brother. Defendant allowed Turner to stay at Banks' house, which the Blackstones used for meetings and to store guns.

Defendant represented that in November of 1994, he shot a regent in the rival gang, the Gangster Disciples and subsequently learned that the Gangster Disciples had placed a "nationwide hit" on him. Defendant said that Banks told him that Claudio had told the Gangster Disciples that he

7

shot their regent and that the Blackstones' meetings were held at her house. Defendant thought Banks wanted to, "whip Anna's ass."

Defendant said that on the evening Claudio and White came to Banks' house, Turner was supposed to receive a violation at the conclusion of the gang meeting because he had been disrespectful towards a general in the gang. Defendant thought that Turner wanted to commit a murder to gain respect in the gang. At Banks' house, defendant brought Claudio downstairs to talk to her about what Banks had told him. Defendant then went upstairs, leaving Claudio with Turner and Banks. When defendant returned, he saw Claudio tied up and Turner putting a gag into her mouth. Defendant went back upstairs and talked to White, who was sitting with Carl, also known as "Short Dog," and then returned to the basement to untie Claudio.

Defendant stated that Claudio and White left the house with Turner, Carl and Banks in an automobile, while he left with Lavelle and his brothers in a van and went to pick up some money. On 83rd Street, defendant saw Banks and spoke with her and then drove to 84th Street, where he heard gunshots and a woman's screams coming from Foster Park. Shortly thereafter, Banks' vehicle appeared and Turner got out, holding a gun. Turner told defendant that he killed Claudio by shooting her in the back and the head and indicated that Carl should be killed because he failed to kill White. Defendant took a .380 semiautomatic handgun from Turner, which defendant recognized as a Blackstones' gun, and a .32 caliber revolver from Carl, which defendant did not recognize, and put them on the side of his mother's house on Sangamon Street. Later, defendant told police where to find the gun that killed Claudio.

At trial, defendant testified on his own behalf. His testimony was largely duplicative of his prior statements as related by Officer Leracz and Assistant State's Attorney Michael Falagario. Defendant additionally testified that Banks and Kimoni Pollard were Gangster Disciples and that he did not believe Banks' story about Claudio talking to the Gangster Disciples because he thought Banks was jealous of Claudio because he used to date her. Defendant stated that when Claudio and White were first leaving Banks' house, Banks ran up to them, yelling, and defendant had Mario intercede because he thought Banks might try to fight Claudio. Defendant said that when Claudio and White returned to the house, Turner was supposed to receive a punishment for pulling a weapon on another gang member. Initially, Turner's punishment was to consist of having to perform exercises, but he refused, and his punishment was increased to a "six minute violation," which meant that he would be beaten for six minutes. Defendant stated that at one point he went into the basement of the house and saw Lavelle and his brothers beating Turner, and Turner fighting back. Defendant broke up the fight, made Turner perform 360 sit-ups, and the parties went upstairs. Defendant then returned to the basement with Claudio and asked her if she said anything to the Gangster Disciples, which she denied. Banks, Turner and some other people came downstairs and also questioned Claudio. Defendant left but returned later and found Claudio tied and gagged. Defendant untied Claudio, gave her money and camera back, and offered her money for a new coat and a cab, but Claudio said that Banks was taking them home.

Defendant stated that when he left the house in the van with Lavelle and his brothers, he drove to 81st Street to pick up some money and then went to 83rd Street, to purchase some marijuana. Afterwards, defendant parked the van near Foster Park and was smoking the marijuana when Banks

stopped her vehicle nearby. Defendant told Banks to leave because he did not want to draw attention to himself and then drove to 84th Street, where he heard gunshots and screaming. Defendant then drove to Sangamon Street, and, a short time later, Banks' vehicle pulled up, and Turner and Carl got out, carrying guns. Turner said that he had shot Claudio and that Carl had supposedly shot at White but missed because he only had one bullet. Defendant took the guns and gave them to Mario, who put them on the side of defendant's mother's house.

Defendant testified he did not tell Banks to drive Claudio and White to the park, nor did he instruct Turner to kill Claudio or White. Defendant said that the killing of Claudio was a violation because it would bring police into the area where Blackstones sold drugs. Defendant stated there was no rivalry between the gangs on the level that he operated because the gangs came togther to sell drugs, and in any event, Claudio did not know any of the Blackstones' secrets, so she could not reveal anything significant to the Gangster Disciples.

At the jury instruction conference, defense counsel objected to the issuance of IPI Criminal 3d No. 3.14, instructing the jurors that they could consider the evidence of defendant's other criminal offenses only as it related to the issue of motive. The circuit court gave the instruction over defendant's objection.

In closing arguments, the prosecution made the following statements, to which defendant now assigns error:

> "So, now he comes into court, and he tries to sell you on something, and he is trying to sell you on some kind of love triangle. *** It never came up in December when he was asked about it. It never came up in January. He was asked what happened and he, at that

time, never said anything about this concern for Anna and their relationship. <u>It's a lie made up for you people, and don't let him get away with it."</u> (Emphasis added.)

and

"<u>The thing to add insult to injury is that her poor family has to sit here and listen that her killer was having some kind of romantic relationship with her daughter?</u> Absolutely not. He made that up to shirk his responsibility, to insulate himself from what he had done." (Emphasis added.)

After the submission of this and other evidence, defendant was convicted of the first degree murder of Claudio and the attempted first degree murder of White, but was acquitted of the aggravated discharge of a firearm in the direction of White. He was sentenced to an extended term of 60 years' imprisonment for attempted first degree murder to run concurrently with a natural life sentence for first degree murder.

## DISCUSSION

Defendant first asserts that he was denied a fair trial because of prosecutorial misconduct. As evidence of this misconduct, defendant points to the State's actions in coaching Lavelle Dunn into changing his testimony regarding Kimoni Pollard's gang affiliation, and in labeling defendant a liar and making reference to the victim's family in closing arguments. Defendant acknowledges that in the absence of contemporaneous objections at trial and in his post trial motion, the issue has been waived. See People v. Enoch, 122 Ill. 2d 176, 186 (1988). However, defendant urges us to examine the issue under the plain error rule. 134 Ill. 2d R. 615(a).